AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

United States of America
v.

PERRY MOSDROMOS

Case No. 3 12 70986

*Defendant(s)*

FILED
AUG 30 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EDL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of ____June 7, 2012____ in the county of ____San Mateo____ in the
____Northern____ District of ____California____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |

Max. penalties: 20 years' imprisonment; $1 million fine; lifetime supervised release; 3 year minimum term of supervised release; $100 special assessment

This criminal complaint is based on these facts:
Please see the attached affidavit of FBI Special Agent Matthew S. Beaupain.
(Approved as to form: _____ AUSA Kevin J. Barry)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

____Matthew S. Beaupain, Special Agent, FBI____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug 30, 2012

_____
*Judge's signature*

City and state: ____San Francisco, CA____    ____Hon. Elizabeth D. Laporte, U.S. Magistrate Judge____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Matthew S. Beaupain, Special Agent, Federal Bureau of Investigation (FBI), first being duly sworn, do depose and state:

## I. INTRODUCTION

1. I make this affidavit in support of a criminal complaint against Perry MOSDROMOS (hereafter "MOSDROMOS") for violations of Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance.

2. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.

## II. AGENT BACKGROUND

3. I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been so employed since November of 2005. I am currently assigned to the San Francisco Field Division of the FBI, and I investigate cases involving violent gangs, drug trafficking, and violent fugitives. I have received training at the FBI Academy in Quantico, Virginia, including training on violent street gangs, criminal case management, informant development, Title III investigations and the identification, use, packaging and sales of controlled substances. I have participated in numerous local and federal search warrants and

arrests involving alleged narcotics trafficking, and I have participated in numerous investigations of narcotics traffickers and violent street gangs. I have been the Affiant on previous Title III investigations involving narcotics traffickers and violent street gangs. These investigations have involved, but were not limited to, the use of confidential informants, wire and physical surveillance, Title III, consensual wire interception (Title II), telephone toll analysis, investigative interviews, and the service of search and arrest warrants.

4.	I have interviewed numerous gang members, drug dealers, drug users, and knowledgeable confidential informants about the lifestyles, appearances, and habits of drug dealers, users, and criminal street gang members and associates. I have become familiar with the manner in which narcotics traffickers smuggle, package, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which gang members and narcotics traffickers use telephones, cellular telephone technology, intentionally vague language, coded communications and slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities and to thwart law enforcement investigations. I have had discussions with other law enforcement personnel about the packaging and preparation of narcotics, the distribution methods of illegal narcotics traffickers, and the security measures that gang members, associates, and narcotics traffickers often employ. I have also examined documentation of various methods by which crystal methamphetamine, cocaine, crack cocaine, heroin, marijuana, and other illicit drugs are smuggled, transported, and distributed. I have participated in numerous acts of surveillance of gang members and narcotics traffickers. During these acts of surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the ways in which narcotics traffickers conduct clandestine meetings. I have participated in other investigations that involved the interception of wire communications, and I have been directly involved in the review and deciphering of intercepted coded conversations between gang members, associates, and narcotics traffickers that were later corroborated by surveillance, seizures, or defendants' statements.

5.  I have received formal training at the FBI's Basic Agent Training in Quantico, Virginia. During this four-month course, I received several hundred hours of instruction in law enforcement investigations, including the identification, use, packaging, and sales of controlled substances. I have also attended numerous training schools and seminars related to gang and narcotics investigations, including actual training on "cooking" crack cocaine and heroin in a controlled training environment. I have also been trained and provided instruction on drug trafficking methods, money laundering methods, and techniques for investigating those crimes. Throughout my law enforcement career, and as part of my participation in this investigation, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local investigators. I am one of the case agents participating in the investigation of MOSTROMOS, and others, for narcotics trafficking offenses

## III.   APPLICABLE LAW

6.  Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance.

## IV.   BACKGROUND OF INVESTIGATION

7.  On April 23, 2012, Homeland Security Investigations (HSI) intercepted a package containing steroids at a United Parcel Service (UPS) Store originating from China and addressed to 325 Sharon Park Drive, UPS box #654, Menlo Park, California. On May 18, 2012, HSI intercepted a package containing thousands of Xanax pills at a UPS Store originating from the United Kingdom and addressed to the above mentioned UPS box. The UPS box was identified as being utilized by MOSDROMOS.

## V.   FACTS ESTABLISHING PROBABLE CAUSE

### A. June 7, 2012 Seizure of Controlled Substances

8.  On June 7, 2012, the FBI assisted Menlo Park Police Department (MPPD) and HSI in executing

1

two state search warrants. One search warrant was for MOSDROMOS' residence at 201 Loma Verde Avenue, Apartment E, Palo Alto, California. The other search warrant was for MOSDROMOS' business, One 2 One Fitness, located at 325 Sharon Park Drive, #B-6, Menlo Park, California. Officers and agents located gallons of steroids, a conversion lab (pills to liquid), thousands of prescription pills, MDMA, other controlled substances, and shipping labels addressed to locations all across the United States and to many countries overseas. MOSDROMOS was arrested by state officers for violations of California Health & Safety Code Section 11378, 11375(B)(1), and 11379.6(a), all controlled substance offenses.

9. During the search of MOSDROMOS' residence, FBI Task Force Officer (TFO) Sergeant Cowans searched a black cellular telephone. MOSDROMOS admitted during an interview later that the telephone belonged to MOSDROMOS. While looking through the cellular telephone, TFO Cowans intercepted an incoming text message from someone wanting to purchase anabolic steroids. TFO Cowans pretended to be MOSDROMOS and answered the buyer's text. The buyer indicated that he was going to travel to MOSDROMOS' residence to purchase the steroids. The buyer drove to MOSDROMOS' residence and admitted to law enforcement that the buyer was there to purchase steroids. The buyer had previously negotiated a deal with MOSDROMOS to purchase 500 tablets of Anavar for $150. The buyer said he had purchased injectable testosterone in the past from MOSDROMOS. The text messaging between TFO Cowans and the prospective buyer were found in the buyer's telephone. The buyer stated that the cellular telephone that the buyer had in his possession belonged to the buyer.

## B. June 7, 2012 Interview of MOSDROMOS

10. On June 7, 2012, MPPD officers interviewed MOSDROMOS after obtaining a Miranda Waiver from him. MOSDROMOS admitted to residing at 201 Loma Verde Avenue, Apartment E, Palo Alto, California, for approximately two years. MOSDROMOS said he was the owner of One 2 One Fitness, located at 325 Sharon Park Drive, Suite B-6, Menlo Park, California. MOSDROMOS admitted to being the sole person responsible for UPS box #654, located at the UPS Store at 325 Sharon Park Drive, Suite B-6, Menlo Park, California and P.O. Box 68, located in San Mateo, California. MOSDROMOS stated

no one else has access to the above mentioned mail boxes.

11. MOSDROMOS resides with his fiancée. However, MOSDROMOS stated that his fiancée and employees do not know that he traffics and manufactures controlled substances. MOSDROMOS told his fiancée that the shipments he receives are supplements. MOSDROMOS initially denied ownership of the prescription medications and anabolic steroids located inside his residence. However, he later admitted he has been selling prescription medications and manufacturing anabolic steroids.

12. MOSDROMOS advised the prescription medications located inside his apartment were shipped to him from various countries (China, UK, Pakistan, India, Mexico, etc.). MOSDROMOS would then mail the prescription medications to various people after he receives instructions to do so. MOSDROMOS claimed that he traffics prescription medications and steroids to make extra money so he can help pay for his mother's medical expenses and that he only recently became involved with the selling of the prescription medications. He reported that a $3,000 investment of raw product can be turned into $30,000.

13. MOSDROMOS stated the operation is much bigger than he; however, MOSDROMOS did not disclose any co-conspirators or elaborate as to how the operation works. MOSDROMOS admitted to placing an order for the anabolic steroids that were intercepted by HSI, but he claimed to be unaware that thousands of Xanax pills were seized. MOSDROMOS denied that the Xanax pills were destined for him.

14. MOSDROMOS stated he manufactures steroids using "simple chemistry." The labels located within his apartment are labels that MOSDROMOS places on his finished product. MOSDROMOS identified some of the evidence taken from his apartment as "MDMA."

### C. Laboratory Results

15. Due to the large amount of drugs seized from MOSDROMOS' residence on June 7, 2012, only a small percentage was submitted to the Drug Enforcement Administration Laboratory (DEA Lab) for the purpose of analysis. On July 11, 2012, some of the drug evidence was submitted to the DEA Lab and the

results are as follows: a substance having a net weight of 262.7 grams was determined to be Testosterone Cypionate; a substance containing 48 capsules having a net weight of 18.8 grams was determined to be Stanozolol; a substance containing 198 capsules having a net weight of 137.8 grams was determined to be 3, 4-Methylenedioxymethcathinone Hydrochloride (MDMC HCl) (a chemical analogue of MDMA); a substance containing 27 capsules having a net weight of 13.3 grams was determined to be Stanozolol; a substance having a net weight of 197.9 grams was determined to be Nandrolone Decanoate; and a substance having a net weight of 119.3 grams was determined to be 3, 4-Methylenedioxymethcathinone (MDMC).

## VI. CONCLUSION

16. Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents with experience in drug trafficking investigations, I believe there is probable cause to believe that Perry MOSDROMOS violated the following statutes: Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance.

DATED this 30th day of August, 2012.

MATTHEW S. BEAUPAIN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 30th day of August, 2012.

HON. ELIZABETH D. LAPORTE
United States Magistrate Judge

4